UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:16-CV-00140-GNS-HBB

KEVIN L. HADDEN, et al.                                    PLAINTIFFS

v.

MICHAEL WATHEN, Individually and
in his Official Capacity, et al.                            DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiffs' Motion for Partial Summary Judgment (DN 65) and Defendants' Joint Motion for Summary Judgment (DN 67). For the reasons set forth below, Plaintiffs' Motion for Partial Summary Judgment is **DENIED**, and Defendants' Joint Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.

## I.    OVERVIEW

This action involves several civil rights and tort claims brought by Plaintiffs Kevin, Michelle, Nicholas, and Caleb Hadden (collectively, "Plaintiffs" or "the Haddens") against Michael Wathen ("Wathen"), Jason Adkison ("Adkison"), Chad Smith ("Smith") and Tucker Carmichael ("Carmichael") (collectively, "Defendants"), each of whom worked for the Kentucky State Police ("KSP") at all relevant times. (Compl. ¶¶ 1-13, DN 1-1). Plaintiffs seek to hold Defendants liable in their official and individual capacities for engaging in unlawful conduct throughout the course of the arrests and subsequent prosecutions of Plaintiffs. (Compl. ¶¶ 14-119).

## II.    FACTS

Michelle Hadden ("Michelle") contacted a KSP dispatcher on August 12, 2015, and asked the dispatcher to send officers to her home in Alvaton, Kentucky, to defuse a dispute involving one of her sons, Nicholas Hadden ("Nick").[1]  (Michelle Dep. 79:17-80:11).  During the call, Michelle told dispatch that Nick was drunk and trying to fight her husband, Kevin Hadden ("Kevin"), and one of her other sons, Caleb Hadden ("Caleb").  (Michelle Dep. 80:7-86:5).  Dispatch advised Wathen, Adkison, and Smith of the situation, and the officers hurried to the scene.  (Pl.'s Mem. Supp. Mot. Partial Summ. J. Ex. 4, DN 65-5 [hereinafter Call to KSP Dispatch]).  Upon arrival, Wathen and Smith spoke with Kevin, who told them about Nick's behavior and guided them to Nick, who was sitting next to Michelle on the highest step of stairs leading to the Haddens' home.  (Wathen Dep. 64:13-66:7; 68:12-23).

Most of the remaining facts are contested, but there is no dispute that the officers arrested the Haddens.  Specifically:  (i) Wathen arrested Nick for menacing; (ii) Wathen and Adkison arrested Kevin for disorderly conduct; and (iii) Wathen arrested Michelle and Caleb for disorderly conduct.  (*See* Defs.' Mem. Supp. Joint Mot. Summ. J. Ex. 10, at 2-6, DN 67-11 [hereinafter Uniform Citations]).  The versions of the events as related by the parties are as follows:

---

[1] Michelle actually called the Warren County Sheriff's Department ("WCSD") and the WCSD transferred her call to a KSP dispatcher.  (S. Hadden Dep. 79:17-80:11, Mar. 1, 2017, DN 76-1 [hereinafter Michelle Dep.]).  Michelle testified that the WCSD transferred her call because she had sought help from the WCSD earlier in the day and "they [did not] want to deal" with her and her family any longer.  (Michelle Dep. 58:25-79:22).

## A.    **Arresting the Haddens**

### 1.    *Nick's Arrest*

Regarding Nick's arrest, Wathen testified that he approached Michelle and Nick and asked them what was going on and that Michelle responded that Nick was having suicidal thoughts and had been taken to the hospital earlier that day.  (Wathen Dep. 69:12-70:1).  Nick began cursing, telling Michelle that he was not going back to the hospital or anywhere else.  (Wathen Dep. 70:9-19).  Nick then cursed Wathen and "raised his buttocks up off the step and thrust[ed] . . . his [right] hand into [Wathen's] face."  (Wathen Dep. 73:6-12).  Wathen perceived "an immediate threat to [his] safety," so he grabbed Nick's right wrist and forced him onto the concrete walkway leading to the staircase.[2]  (Wathen Dep. 75:3-76:18, 80:9-16).

Plaintiffs' version of the events leading to Nick's arrest is quite different.  Michelle testified that Wathen approached and asked Nick to state his social security number.  (Michelle Dep. 106:5-20).  Nick provided the number, pointed to his family members, and drunkenly spouted:  "that's my [expletive] mama and that's my [expletive] daddy."  (*See* Michelle Dep. 106:17-19).  Wathen responded by getting "up in [Nick's] face," pointing "his finger . . . [at Nick's] nose," and shouting "'[d]on't you ever disrespect me like that again.'"  Nick countered with sarcasm, stating "'excuse [expletive] moi.'"  (Michelle Dep. 108:14-18).  Wathen then went "over the edge":  he grabbed Nick by the hair, slammed him to the concrete, and smashed his head into the ground three times before placing him in handcuffs.  (Michelle Dep. 109:7-10, 118:3-11; K. Hadden Dep. 64:4-6, Mar. 1, 2017, DN 76-2 [hereinafter Kevin Dep.]).  Michelle denied that Nick ever thrust his hand toward Wathen, and Kevin and Caleb corroborated

---

[2] Wathen testified that Nick was under arrest for menacing "at the moment of first physical contact . . . ."  (Wathen Dep. 89:16-90:2).

Michelle's testimony. (Michelle Dep. 115:8-10; Kevin Dep. 57:11-24, 60:5-64:6; C. Hadden Dep. 34:9-35:1, DN 65-7 [hereinafter Caleb Dep.]).

In any event, while Wathen struggled to place Nick in handcuffs, the Hadden family became upset. (Wathen Dep. 91:22-92:7; Smith Dep. 33:13-23, Mar. 2, 2017, DN 65-8). Smith testified that after Wathen took Nick to the ground, Kevin, Michelle, and Caleb became irate, yelling and advancing towards Wathen as if they intended to attack him or insert themselves into the scuffle. (Smith Dep. 33:13-23). To prevent the Haddens from interfering, Smith extended his ASP[3] and told the family to stay back. (Smith Dep. 33:22-23). Though Wathen did not witness the Haddens advancing toward him, he testified that he heard Smith's ASP click as it opened and turned around in time to see Kevin and Michelle retreating. (Wathen Dep. 94:16-95:25). He further testified that, upon hearing Smith open the ASP, he believed that Kevin, Michelle, and Caleb posed a threat to his safety. (Wathen Dep. 138:18-23). Conversely, Kevin and Caleb submitted affidavits suggesting that Smith's decisions to extend his ASP and tell the family to get back were premature and inappropriate, as no member of the Hadden family made movements—threatening or otherwise—toward Nick and Wathen.[4] (*See* K. Hadden Aff. ¶¶ 3-5, DN 76-5 [hereinafter Kevin Aff.]; C. Hadden Aff. ¶¶ 3-5, DN 76-4 [hereinafter Caleb Aff.]). Ultimately, with Adkison's help, Wathen placed Nick in handcuffs and escorted him to the police cruiser. (Smith Dep. 34:24-35:1).

### 2. *Kevin's Arrest*

Immediately after Nick's arrest, Kevin called 911 to report Wathen's alleged misconduct and request an ambulance for his son. (*See* Pls.' Mem. Supp. Partial Summ. J. Ex. 9, DN 65-9

---

[3] An ASP is a brand of telescoping baton.

[4] Kevin did, however, testify that he spotted a stone in the yard and that he thought about grabbing it and using it as a weapon against Wathen. (Kevin Dep. 65:10-67:12). His testimony is unclear as to whether he made any movement to lift the stone. (Kevin Dep. 65:10-16).

[hereinafter Kevin 911 Call]). During the course of the call, Kevin reported that Wathen had "slammed [Nick] on his face, on the concrete" because he "spoke out of turn." (Kevin 911 Call 00:18-00:26). He further indicated that he was afraid for his son to be taken away by the police: "if [the police] are gonna waste [Nick] like this on the concrete in front of us, what are they gonna do when they get down the road a few miles off?" (Kevin 911 Call 03:30-03:36).

While Kevin did not threaten the dispatcher or anyone else during the call, he did curse at the officers and the operator heard his foul language, prompting her to contact Carmichael, Wathen's supervisor, and report that Kevin was screaming curse words and arguing with her on the 911 line. (Kevin 911 Call 02:06-02:14; *see also* Owens Dep. 31:16-18, Aug. 23, 2017, DN 67-4). The operator further reported that the situation appeared tense. (Owens Dep. 47:8-24).

In response, Carmichael told the operator to tell Wathen to call him as soon as he could. (Carmichael Dep. 56:12-18, Mar. 2, 2017, DN 65-10). Wathen called Carmichael and reported the events that had and were occurring at the Hadden residence and, while on the phone with Wathen, Carmichael heard chaotic sounds (i.e., the Haddens screaming and yelling) in the background. (Carmichael Dep. 61:6-62:17). Carmichael testified that, as a result, he told Wathen that "[i]t sounds like someone may need to go to jail." (Carmichael Dep. 63:24-64:1). Beyond that, the record contains conflicting testimony regarding whether Carmichael told Wathen "to handle" Kevin, but there is no testimony that Carmichael directed Wathen to arrest Kevin.[5] (Carmichael Dep. 65:1-6; Wathen Dep. 100:17-102:1).

According to Wathen, after concluding his call with Carmichael, he and Adkison approached Kevin—who was standing on the deck outside of the Hadden's residence and cursing on the phone—and asked him to get off the phone and go inside. (Wathen Dep. 103:15-

---

[5] Carmichael testified that it is not a crime to be upset or use profanity during a 911 call. (Carmichael Dep. 69:14-18).

17).  Kevin profanely refused, which Wathen perceived as acting disorderly.  (Wathen Dep. 103:24-25, 110:3-16).  Wathen then gave Kevin an ultimatum:  go inside or be arrested.  (Wathen Dep. 110:17-18).  Kevin continued to yell, and Wathen believed that he "[w]as about ready to be attacked . . . ."  (Wathen Dep. 111:21-25).  As a result, Wathen decided to arrest Kevin and instructed Adkison to place him in handcuffs.  (Wathen Dep. 111:11-14; Adkison Dep. 42:12-43:4, Mar. 2, 2017, DN 65-12).

Michelle and Kevin report the events surrounding Kevin's arrest differently.  Kevin testified that Adkison walked up to him while he was talking to the 911 operator and said "[y]ou're going, too, old man," and then placed him in handcuffs.  (Kevin Dep. 71:1-2). Michelle—who was standing next to Kevin at the time of his arrest—testified that Wathen approached Kevin while he was on the porch, told him that "he was upset because Kevin was calling 911" and "tattling" on him and the other officers for arresting Nick, and then cuffed him. (Michelle Dep. 144:13-25).

Kevin was arrested by Wathen for disorderly conduct.[6]  (Wathen Dep. 113:5-7).  Wathen said that Kevin's disorderly conducted included "creat[ing] a public nuisance"—i.e., shouting profanity—and "disregard[ing] [his] order to go inside . . . ."  (Wathen Dep. 113:10-12).

### 3.  *Michelle's Arrest*

Defendants have testified that—much like Kevin—Michelle began screaming profanity at them shortly after Nick's arrest.  (*See, e.g.*, Adkison Dep. 48:4-9).  Wathen testified that, unlike Kevin, Michelle was yelling threats.  (Wathen Dep. 117:25-118:1).  Specifically, Michelle

---

[6] Smith's role in Kevin's arrest is unclear.  While Wathen and Adkison appeared to testify that they were the only officers involved in Kevin's arrest, Smith indicated in his answers to Plaintiffs' interrogatories that he assisted them in placing handcuffs on Kevin and Michelle. (Pls.' Resp. Opp'n Defs.' Joint Mot. Summ. J. Ex. 3, ¶ 5 DN 76-3 [hereinafter Smith Disc. Resp.]).

was yelling: "I will kick your ass, you [expletive]." (Wathen Dep. 118:1). As a result, the officers ordered her to go inside her home and, at least initially, she complied. (Wathen Dep. 119:23-120:3). Wathen testified, however, that she came back outside and continued yelling threats. Michelle's purported threat was that she was going to "kick [their] asses." (Wathen Dep. 118:3-9; 120:4-5). Wathen testified:

> Q. So, she's saying it over and over again?
> A. Over and over and over, almost in a dramatic theatrical moment, but also almost in a hysterical I kind of believed her sense. *Not so much that I'm really thinking she's going to come right at me*, but enough that I'm like, "Keep it up and you're going to be arrested, too."

(Wathen Dep. 118:10-15 (emphasis added)). Notably, Smith testified that Michelle did not make any threats toward him or anyone else, and Adkison could not recall whether she made threats. (Smith Dep. 42:1-7; Adkison Dep. 48:23-49:5).

On the other hand, Michelle testified that after Nick's arrest she was in shock so she called her daughter, Jessalyn Hadden ("Jessalyn"), to explain what was going on. (Michelle Dep. 122:1-5). At the same time, Michelle was purportedly using her phone to record the officers' behavior. (Michelle Dep. 143:6-13). While on the phone, Michelle could not remember whether she used curse words or made threats, but she testified that she was upset. (Michelle Dep. 128:11-129:14). In Michelle's view, she was arrested because Wathen "was pissed off because he had told [her] to go in the house and [she] was back on the porch," and he "wanted [her] phone" to prevent her from recording the events. (Michelle Dep. 143:6-13).

Ultimately, Wathen arrested Michelle for disorderly conduct. (Michelle Dep. 143:6-13; Wathen Dep. 121:1-10). Wathen indicated that Michelle's disorderly actions were "raising her voice, screaming, making threats toward law enforcement, and refusing to obey a command to go inside[.]" (Wathen Dep. 123:1-6).

### 4.    *Caleb's Arrest*

Wathen arrested Caleb soon after he arrested Michelle.  (Dash Cam Video 2 21:13:25-21:14:03, DN  5).  According to Wathen, Caleb became hysterical after his mother's arrest and began begging Wathen to "un-arrest" her.  (Wathen Dep. 126:25-127:7).  Wathen told Caleb to go inside, but, according to Adkison, instead of complying with that order, Caleb clenched his fists, started shaking, and began "shouting and screaming in . . . Wathen's face, '[t]ake me to jail' . . . ."  (Adkison Dep. 55:1-7).  Smith, on the other hand, testified that Caleb was not cursing at or making threats toward Wathen at the time that he was arrested.  (Smith Dep. 44:13-45:1).

Predictably, Caleb remembers the events precipitating his arrest differently.   He described his arrest as follows:

> I'm standing in front of the porch; and I'm standing there, I believe, with Officer Smith; and Wathen walks over, I'm asking what they are being detained for at that point, I request Officer Wathen's badge I.D. number. […] Told me to be quiet or I was going, too.  I repeated the fact that, "I am not posing a threat to you."  I put my hands up in the air and asked for his badge number again.  He started towards me in an aggressive manner.  At that point, I got down on my knees with my hands up and I said, "All I want is a badge number and I.D.—" or "—I.D. number," and I was arrested like that.  I was already on my knees.  He pushed me to the ground, put his knee in my back, cuffed me, and I was gone.

(Caleb Dep. 44:23-45:11).  Michelle corroborated Caleb's testimony.  (*See* Michelle Dep. 144:1-17).

Regardless, Wathen arrested Caleb for disorderly conduct.  (Wathen Dep. 133:10-13).  According to Wathen, Caleb's disorderly conduct included raising his voice and refusing to comply when ordered to go inside.  (Wathen Dep. 133:10-13).

### B.    <u>Detaining & Prosecuting the Haddens</u>

After their arrests, the officers drove the Haddens to the Warren County Regional Jail ("WCRJ") and booked them.  (Pls.' Mot. Partial Summ. J. Ex. 14, at 1-3, DN 65-15 [hereinafter

WCRJ Booking Records]). Nick was initially charged with menacing and resisting arrest, while Kevin, Michelle, and Caleb were charged with disorderly conduct. (*See* Uniform Citations 2-4).

While Kevin, Michelle, and Caleb were transported to WCRJ and booked without incident, Nick was not. Wathen testified that while driving Nick to jail, Nick threatened to shoot him with a handgun.[7] (Wathen Dep. 136:24-137:2). Additionally, during booking, WCRJ employees found marijuana in Nick's pocket. (*See* Uniform Citations 6). As a result, Wathen also charged Nick with terroristic threatening and possession of marijuana. (Uniform Citations 5-6).

The Haddens were detained for a few of hours and then bonded out of jail. (WCRJ Booking Records 2-4). While Nick pled guilty to possession of marijuana, the Commonwealth prosecuted the remaining Hadden defendants on the other charges listed in their uniform citations until May 13, 2016, at which time the prosecutor dropped the disorderly conduct charges pending against Kevin, Michelle, and Caleb.[8] (Pls.' Mem. Supp. Mot. Partial Summ. J. Ex. 15, DN 65-16 [hereinafter Dismissal Video]; Nick Dep. 62:4-11). With respect to those charges, the prosecutor stated that Kevin, Michelle, and Caleb could not have committed disorderly conduct because they only disturbed the police. (Dismissal Video 09:40:05-09:40:27).

---

[7] Nick testified that he was actually singing a song about a .357 magnum pistol. (N. Hadden Dep. 42:5-21, Mar. 1, 2011, DN 67-9 [hereinafter Nick Dep.]).

[8] Nick testified that the prosecution dropped the charges against him for menacing, resisting arrest, and terroristic threatening, but the record is unclear as to when the prosecution made the decision to drop those charges. (Nick Dep. 62:4-7).

## C.    **Current Litigation**

### 1.    *Remaining Claims*

Not long after the prosecutor dropped the charges against them, the Haddens initiated the instant action. (*See* Compl.). The parties engaged in discovery and then filed dispositive motions. (Defs.' Mem. Supp. Joint Mot. Summ. J., DN 67-1 [hereinafter Defs.' Mot. Summ. J.]); Pls.' Mem. Supp. Mot. Partial Summ. J., DN 65-1 [hereinafter Pls.' Mot. Partial Summ. J.]). After discovery, Plaintiffs withdrew certain of their claims.[9] (*See* Pls.' Resp. Opp'n Defs.' Joint Mot. Summ. J. 36-39, DN 76 [hereinafter Pls.' Resp.]). The following claims remain:

*Nick's Claims*: Nick claims that Wathen violated the Fourth and Fourteenth Amendments—and is liable pursuant to 42 U.S.C. § 1983—when Wathen: arrested and detained Nick without probable cause (Counts 1 and 2); used excessive force during the arrest (Count 3); maliciously prosecuted Nick for menacing, resisting arrest, terroristic threatening, and possession of marijuana (Count 8); and arrested Nick for exercising his First Amendment rights (Count 10). Nick also claims that Wathen committed the following common-law torts: assault (Count 4); battery (Count 5); abuse of process (Count 6); malicious prosecution (Count 7); and false arrest (Count 9).

*Kevin's Claims*: Kevin alleges that Defendants violated the Fourth and Fourteenth Amendments and are therefore liable pursuant to 42 U.S.C. § 1983 when they arrested and detained him without probable cause (Counts 1 and 2); maliciously prosecuted him for disorderly

---

[9] Nick dropped all of his claims against Smith, Adkison, and Carmichael. He also withdrew his claim for unlawful search of his effects that occurred incident to his arrest and his claims against Smith and Carmichael for assault and battery. Michelle withdrew her claim for an unlawful search that allegedly occurred incident to her arrest, along with all of her claims against Adkison and Carmichael. In addition, she withdrew her claims against Smith for assault and battery. Caleb withdrew his excessive force claim, his assault and battery claims against Defendants other than Wathen, and all of his claims against Carmichael.

conduct (Count 8); and arrested him for exercising his First Amendment rights (Count 10). Kevin also claims that Defendants committed abuse of process (Count 6), malicious prosecution (Count 7), and false arrest/imprisonment (Count 9), in violation of Kentucky law. Finally, Kevin claims that Wathen and Adkison committed assault and battery (Counts 4 and 5)

*Michelle's Claims*:  Michelle claims that Wathen and Smith violated the Fourth and Fourteenth Amendments and are therefore liable pursuant to 42 U.S.C. § 1983 when they arrested and detained her without probable cause (Counts 1 and 2); maliciously prosecuted her for disorderly conduct (Count 8); and arrested her for exercising her First Amendment rights (Count 10).  Michelle also claims that Wathen and Smith committed abuse of process (Count 6), malicious prosecution (Count 7), and false/arrest imprisonment (Count 9).  Finally, Michelle alleges that Wathen committed assault and battery (Counts 4 and 5).

*Caleb's Claims*:  Caleb alleges that Wathen, Adkison, and Smith violated the Fourth and Fourteenth Amendments and are liable pursuant to 42 U.S.C. § 1983 when they arrested and detained him without probable cause (Counts 1 and 2); maliciously prosecuted him for disorderly conduct (Count 8); and arrested him for exercising his First Amendment rights (Count 10). Caleb also claims that Defendants committed abuse of process (Count 6), malicious prosecution (Count 7), and false arrest/imprisonment (Count 9), in violation of Kentucky law.  Finally, Caleb claims that Wathen committed assault and battery (Counts 4 and 5).

### 2.    *Pending Motions*

At the close of discovery, Plaintiffs moved for partial summary judgment, and Defendants moved for summary judgment as to each of Plaintiffs' claims.  In their motion, Plaintiffs argued that they are entitled to summary judgment as to Kevin, Michelle, and Caleb's claims as listed in Counts 1, 2, and 8 of the Complaint because the undisputed facts show that

Defendants lacked probable cause to arrest them for disorderly conduct or any other offense. (Pls.' Mot. Partial Summ. J. 23-32). Defendants countered that they are entitled to summary judgment on all of Plaintiffs' claims because the undisputed facts show that Defendants had probable cause to arrest and prosecute Plaintiffs for the offenses for which they were arrested, as well as a number of other offenses.[10] (Defs.' Mot. Summ. J. 11-60). The parties have now fully briefed both motions and each is ripe for adjudication.

### III. <u>JURISDICTION</u>

This action arises under the laws of the United States, and this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367.

### IV. <u>STANDARD OF REVIEW</u>

The parties filed cross-motions for summary judgment. Specifically, Defendants seek summary judgment on all of Plaintiffs' claims, and Kevin, Michelle, and Caleb seek summary judgment with respect to their Section 1983 claims for unlawful arrest and detention and malicious prosecution. (*See* Defs.' Mot. Summ. J. 60; Pls.' Mot. Partial Summ. J. 32).

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] party moving for summary judgment may satisfy its burden [of showing] that there are no genuine issues of material fact simply 'by pointing out to the court that the [non-moving party], having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.'" *Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005) (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)). After the movant

---

[10] Though Defendants raise other arguments with respect to Plaintiffs' claims, their primary contention is that all of Plaintiffs' claims fail because they had probable cause to arrest Plaintiffs for one or more offenses. (*See, e.g.*, Defs.' Mot. Summ. J. 53-59).

shows "that there is an absence of evidence to support the nonmoving party's case," the non-moving party must identify specific facts that can be established by admissible evidence, which create a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). While the Court must view the evidence in a light most favorable to the non-moving party, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

## V.     DISCUSSION

As an initial matter, it is necessary to address the impact that the doctrines of sovereign and governmental immunity have on Plaintiffs' claims against Defendants in their official capacities. Sovereign immunity "bars [Section] 1983 suits against a state, its agencies, and *its officials* sued in their official capacities for damages." *Cady v. Arenac Cty.*, 574 F.3d 334, 342 (6th Cir. 2009) (emphasis added) (citation omitted). Governmental immunity likewise insulates state officials from personal liability on claims brought against them under Kentucky law in their official capacities. *See Colebrook v. Ky. Dep't of Motor Vehicle Enf't*, No. 08-110-DLB, 2009 WL 536600, at *8 (E.D. Ky. Mar. 3, 2009). Given that all Defendants work for the KSP and are thus state officials—and that they are being sued for damages—Defendants are entitled to summary judgment as to Plaintiffs' Section 1983 (Counts 1, 2, 3, 8, and 10) and state law (Counts 4, 5, 6, 7, and 9) claims insofar as those claims seek to hold Defendants personally liable

for claims asserted against them in their official capacities. *See, e.g.*, *id.* (dismissing a plaintiff's state law claims asserted against KSP officer in his official capacity).[11]

Having determined that all of Plaintiffs' official-capacity claims must be dismissed, the Court will now assess Plaintiffs' individual capacity claims. Because Plaintiffs assert a number of claims—each of which turns on particularized factual analyses—the Court will address Plaintiffs' claims either individually or in small groups.

### A.    Counts 1, 2, and 9:  Unlawful/False Arrest & Detention

In Counts 1, 2, and 9, Plaintiffs challenge the legality of their arrests.  Specifically, Plaintiffs allege in Counts 1 and 2 that Defendants violated their Fourth and Fourteenth Amendment rights when they:  (i) "unlawfully seiz[ed] the Plaintiffs and [held] them against their will, thereby depriving them of liberty without due process of law and without probable cause," and (ii) "unlawful[ly] and malicious[ly] de[tained] and confine[d] . . . the Plaintiffs . . . ." (Compl. ¶¶ 60, 66).   Likewise, Plaintiffs allege in Count 9 that Defendants falsely arrested them—i.e., Defendants "detained the Plaintiffs and deprived [them] of their liberty . . . without reasonable justification, authority, or privilege."  (Compl. ¶¶ 111-12).

Though Counts 1 and 2 present federal causes of action and Count 9 involves state law, each claim presents the same preliminary question:  whether Defendants had probable cause to arrest Plaintiffs.   Counts 1 and 2 arise under Section 1983, so Plaintiffs must show that Defendants deprived them of a constitutional or federally protected right while acting under color of law.  *See Waters v. City of Morristown*, 242 F.3d 353, 358-59 (6th Cir. 2001).   The

---

[11] Though the parties did not discuss Plaintiffs' official-capacity claims in their briefings—much less draw a distinction between those claims and the claims against Defendants in their individual capacities—the Court has the power to dismiss these claims pursuant to immunity doctrines *sua sponte*.  *See Cady*, 574 F.3d at 345.

parties do not dispute that Defendants acted under color of law at all times relevant to Plaintiffs' causes of action. The constitutional right that Defendants allegedly violated is the Fourth Amendment, which prohibits an official from conducting an unreasonable seizure—that is, as it relates to this case, a warrantless arrest and detention without probable cause. *See United States v. Dotson*, 49 F.3d 227, 230 (6th Cir. 1995) ("[T]he test for whether an arrest is constitutionally valid is 'whether, at the moment the arrest was made, the officers had probable cause to make it . . . .'" (citations omitted)). Similarly, to prevail on their false arrest claim, Plaintiffs must present evidence showing that they were arrested and that Defendants had no "*reasonable justification*, *authority*[,] or *privilege*" to support the arrests.[12] *Banks v. Fritsch*, 39 S.W.3d 474, 479 (Ky. App. 2001) (emphasis added). In other words, Plaintiffs' false arrest claim is a claim that Defendants arrested them without a "reasonable justification"—i.e., without probable cause. *See id.*

Once that preliminary question is answered, the remainder of the analysis for Counts 1, 2, and 9 turn on the question whether the Defendant implicated in any given Plaintiff's arrest is entitled to immunity. Much like the federal and state causes of actions described above, the applicable federal immunity doctrine (qualified immunity) is nearly identical to Kentucky immunity law (qualified official immunity) in that both analyses ultimately depend on whether the official acted reasonably or in good faith. *See, e.g.*, *Yanero v. Davis*, 65 S.W.3d 510, 523 (Ky. 2001) (using federal precedent regarding an official qualified immunity from a Section 1983 claim to develop Kentucky's doctrine of qualified official immunity).

---

[12] The Court notes that Plaintiffs styled their claim as one for "false arrest/false imprisonment," but Kentucky courts have held "that in instances involving officers of the law there is simply no distinction between false arrest and false imprisonment." *Lexington-Fayette Urban Cty. Gov't v. Middleton*, 555 S.W.2d 613, 619 (Ky. App. 1977). The Court will therefore treat these two claims as one and the same.

As a result, the analysis for Counts 1, 2, and 9 involves two questions: (i) whether Defendants had probable cause to arrest Plaintiffs; and (ii) whether Defendants are entitled to qualified immunity as to Plaintiffs' Section 1983 claims and/or qualified official immunity as to Plaintiffs' state law claims. Each inquiry is addressed below.

1. *Merits*

The Supreme Court has long held that "a warrantless arrest by a law officer is reasonable under the Fourth Amendment [only] where there is probable cause to believe" that the arrestee has committed an offense. *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (citations omitted). "Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed." *Logsdon v. Hains*, 492 F.3d 334, 341 (6th Cir. 2007) (quoting *Henry v. United States*, 361 U.S. 98, 102 (1959)). "The inquiry 'depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest . . . .'" *Id.* (quoting *Devenpeck*, 543 U.S. at 152).

Further, the arresting officer need not have probable cause to arrest the arrestee for the offense actually listed in the arrestee's citation. *See Devenpeck*, 543 U.S. at 153-54. The officer need only have probable cause to believe that the arrestee committed or was committing *some offense*, even if unrelated to the offense for which the arrestee was ultimately charged. *See id.*; *Amis v. Twardesky*, 637 F. App'x 859, 861 (6th Cir. 2015) ("The officer can lawfully arrest the plaintiff so long as there is probable cause to arrest her for some crime, even if the crime for which there is probable cause is different from the stated crime of arrest." (citation omitted)). Finally, "[w]hether an officer is authorized to make an arrest ordinarily depends, in the first instance, on state law." *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979) (citations omitted).

a.     **Nick**

Wathen arrested Nick for menacing and resisting arrest.  (Defs.' Mot. Summ. J. 18-20, 37-38).  Under Kentucky law, "[a] person is guilty of menacing when he intentionally places another in reasonable apprehension of imminent physical injury."  KRS 508.050(1).  A person resists arrest "when he intentionally prevents or attempts to prevent a peace officer . . . from effecting an arrest . . . by . . . [u]sing or threatening to use physical force or violence against the peace officer . . . or [u]sing any other means creating a substantial risk of causing physical injury to the peace officer . . . ."  KRS 520.090(1).

The facts related to whether Wathen had probable cause to arrest Nick for menacing are in dispute.  Wathen testified that he had probable cause to arrest Nick for menacing because Nick "raised his buttocks up off the step and thrust[ed] . . . his [right] hand into [Wathen's] face," thereby causing Wathen to perceive "an immediate threat to [his] safety."  (Wathen Dep. 73:6-12, 75:3-76:18, 80:9-16).  Plaintiffs, however, testified that Nick never made any movements from which Wathen could have reasonably feared for his safety.  (Michelle Dep. 115:8-10; Kevin Dep. 57:11-24, 60:5-64:6; Caleb Dep. 34:9-35:1).

Given the factual dispute whether Wathen had probable cause to arrest Nick for menacing, it is equally uncertain whether Wathen had probable cause to arrest Nick for resisting arrest.  Kentucky law provides that "where the attempt to arrest is unlawful in itself[,] . . . the person being arrested may resist with force" without incurring a charge for resisting arrest. *Smith v. Commonwealth*, 244 S.W. 878, 879 (Ky. 1922) (internal quotation marks omitted) (citation omitted).  In other words, Wathen cannot argue that he had probable cause to arrest Nick for resisting arrest if, in fact, he had no justification for arresting Nick in the first place. *See Atkins v. Twp. of Flint*, 94 F. App'x 342, 346 (6th Cir. 2004) (affirming district court's

conclusion that Section 1983 plaintiff "was entitled to resist an unlawful arrest and would not be guilty of resisting arrest" for doing so).

As a result, Wathen is not entitled to summary judgment with respect to Nick's claims asserted in Counts 1, 2, and 9 of the Complaint. The record contains two divergent accounts of Nick's behavior to support Wathen's probable cause to arrest Nick for menacing, and, as a result, a jury must decide whether Wathen violated Nick's Fourth Amendment right to be free from arrest without probable cause.[13] *See Phat's Bar & Grill v. Louisville Jefferson Cty. Metro Gov't*, 918 F. Supp. 2d 654, 666 (W.D. Ky. 2013) (denying summary judgment when record contained conflicting evidence regarding whether the defendant had probable cause to arrest the plaintiff).

### b. Kevin, Michelle, and Caleb[14]

Prior to addressing Kevin, Michelle, and Caleb's claims as alleged in Counts 1, 2, and 9, the Court must delineate: (i) what offenses for which Defendants may argue that they had probable cause to arrest Plaintiffs; and (ii) which Defendants were involved—and the scope of their involvement—in any given Plaintiffs' arrest.

*First: Alternate Offenses*. Disorderly conduct is the charge that appears in Plaintiffs' citations. (*See* Uniform Citations). Defendants claim, however, that that they lawfully arrested Plaintiffs because they had probable cause to arrest them for offenses *other than* disorderly

---

[13] Wathen also argues that he had probable cause to arrest Nick for terroristic threatening (based on Nick's purported threat to shoot Wathen with a handgun) and possession of marijuana. (Defs.' Mot. Summ. J. 18-20). But the legality of Nick's arrest cannot turn on whether Wathen had probable cause to arrest Nick for those offenses because the facts related to them did not come to light until *after* Nick's arrest. *See Harris v. Goins*, No. 6:15-151-DCR, 2017 WL 3097613, at *8 (E.D. Ky. July 20, 2017) ("It is well-established that an arrest may not be justified by evidence *discovered after the fact*." (emphasis added)).
[14] The Court will use the term "Plaintiffs" to refer to Kevin, Michelle, and Caleb in this section, even though the Court previously defined "Plaintiffs" to include Nick.

conduct.[15]  Defendants argue that they could have arrested:  (i) Kevin for menacing, obstructing governmental operations, and harassing communications; (ii) Michelle for menacing, obstructing governmental operations, and terroristic threatening; and (iii) Caleb for menacing.  (*See, e.g.*, Defs.' Mot. Summ. J. 27-33).

Plaintiffs counter that Defendants are foreclosed from making this argument because—when asked in interrogatories to state "what each [Plaintiff] did with respect to the incident at issue"—Defendants neglected to describe facts that could have given Defendants probable cause to arrest Plaintiffs for those offenses, but instead referred Plaintiffs to their arrest citations, which only list facts supporting their arrests for disorderly conduct.  (Pls.' Resp. 11-13; *see, e.g.*, Smith Disc. Resp. ¶ 5).  According to Plaintiffs, the fact that Defendants did not mention these alternate offenses constitutes "factual testimony that the Plaintiffs' actions described in their arrest citations are the only unlawful actions that they committed . . . ."  (Pls.' Resp. 13).

Plaintiffs' contention is rejected.  Plaintiffs cite no authority for the proposition that Defendants are entirely foreclosed from making an argument based on answers they provided in response to interrogatories.  The Court need not decide whether Plaintiffs' conclusion is correct, however, because—contrary to Plaintiffs' contentions—Defendants' responses to interrogatories *do* set forth facts suggesting that they had probable cause to arrest Plaintiffs for offenses other than disorderly conduct.  (*See* Smith Disc. Resp. ¶ 5; Pls.' Mem. Supp. Mot. Partial Summ. J. Ex. 10, ¶ 5, DN 65-11).  For example, Smith's discovery responses contain facts related to whether Defendants had probable cause to arrest Plaintiffs for menacing, as he reported that Plaintiffs "started yelling and cursing and making movements toward Trooper Wathen" during the course

---

[15] As noted, an "arresting officer need not have probable cause to arrest the arrestee for the offense actually listed in the arrestee's citation" so long as he has probable cause to arrest for some offense.  *Devenpeck*, 543 U.S. at 593-94

of Nick's arrest, and that the officers decided to arrest Plaintiffs "[b]ecause [of] the[ir] aggressive nature . . . ." (*See* Smith Disc. Resp. ¶ 5). The Court will thus entertain the merits of Defendants' theory that they had probable cause to arrest Plaintiffs for committing offenses other than disorderly conduct.[16]

<u>*Second: Delineating Defendants*</u>. The Court must now determine the role (if any) that each Defendant played in any given Plaintiffs' arrest. Plaintiffs assert Counts 1, 2, and 9 against Smith, arguing that he participated in their arrests because he falsely told Wathen that they were "advancing" toward Wathen while he was arresting Nick; otherwise, Wathen could not have known of the facts establishing the probable cause to arrest Plaintiffs for menacing. (*See, e.g.*, Pls.' Resp. 37, n.4). In addition, the record reflects that Smith admitted that he assisted in placing Kevin and Michelle in handcuffs and that he escorted Michelle to the police cruiser—thereby participating in their arrests.[17] (Smith Disc. Resp. 5).

Similarly, Caleb asserts Counts 1, 2, and 9 against Adkison on the theory that Adkison told Wathen that Caleb menaced him. (Pls.' Resp. 37 n.4). The record, however, contains no evidence indicating that Smith or Adkison told Wathen that Plaintiffs were advancing toward him in a menacing manner. Given that Plaintiffs have not presented facts related to Smith's or Adkison's involvement in Caleb's arrest—or Adkison's involvement in Michelle's arrest—Smith and Adkison are entitled to summary judgment as to Caleb's claims as set forth in Counts

---

[16] Specifically, the Court will assess the merits of Defendants' argument that they had probable cause to arrest: (i) Kevin for menacing, obstructing governmental operations, and harassing communications; (ii) Michelle for menacing, obstructing governmental operations, and terroristic threatening; and (iii) Caleb for menacing. (*See, e.g.*, Defs.' Mot. Summ. J. 27-33).

[17] Other courts have found that an officer's admission that he participated in an individual's arrest—as well as an officer's act of escorting an arrestee to a police car—are sufficient to preclude summary judgment on the question whether the officer participated in the arrestee's arrest. *See Tooley v. Young*, 560 F. App'x 797, 800 (10th Cir. 2014); *Perkins v. Daley*, No. 87 C 9756, 1989 WL 4213, at *2 (N.D. Ill. Jan. 19, 1989).

1, 2, and 9 and Adkison is entitled to summary judgment as to Michelle's claims as set forth in those same counts.[18]

Further, though Kevin asserts Counts 1, 2, and 9 against Carmichael on the grounds that Carmichael "direct[ed] Wathen to arrest Kevin without probable cause," "ma[de] false statements to Wathen about Kevin's call to dispatch," and "ma[de] false statements to Wathen about an alleged interaction between Carmichael and Kevin that did not actually occur," the record does not support these assertions. (*See* Pls.' Resp. 38-39). Carmichael testified that, at most, he told Wathen that—based on what little he knew about the events occurring at the Haddens' residence—"[i]t sound[ed] like someone may need to go to jail." (Carmichael Dep. 63:24-64:1). This statement is not equivalent to Carmichael "directing Wathen to arrest Kevin . . . ." (Pls.' Resp. 39). In any event, Wathen explicitly testified that Carmichael *did not* command him to arrest Kevin. (*See* Wathen Dep. 101:24-102:9). Additionally, the record reveals that the only "false statements" that Carmichael could have made to Wathen were that: (i) he spoke with Kevin; and (ii) Kevin cussed him on the phone. (Wathen Dep. 100:21-25). These facts are immaterial to whether Wathen had probable cause to arrest Kevin for disorderly conduct or some other offense, as Wathen was able to perceive at least some of the facts that gave rise to Kevin's arrest. (Wathen Dep. 101:1-7). Accordingly, Plaintiffs have failed to direct the Court to any evidence regarding Carmichael's involvement in their arrests.

In sum, the record does not support Plaintiffs' position that Smith or Adkison participated in Caleb's arrest, or that that Carmichael aided in Kevin's arrest. Conversely, there appears to be sufficient testimony for the jury to find that: (i) Wathen, Smith, and Adkison participated in Kevin's arrest; (ii) Wathen and Smith participated in Michelle's arrest; and (iii) Wathen arrested

---

[18] This conclusion is underscored by the fact that Caleb testified that Wathen was the only officer involved in his arrest. (Caleb Dep. 45:12-18).

Caleb.  (*See* Wathen Dep. 111:11-14, 121:1-10, 133:10-13; Adkison Dep. 42:12-43:4; Michelle Dep. 143:6-13).

Having set forth the scope of Plaintiffs' claims, the Court will now address whether:  (i) Wathen, Smith, and Adkison had probable cause to arrest Kevin for disorderly conduct, menacing, obstructing governmental operations, or harassing communications; (ii) Wathen and Smith had probable cause to arrest Michelle for disorderly conduct, menacing, obstructing governmental operations, or terroristic threatening; and (iii) Wathen had probable cause to arrest Caleb for menacing.

### i.    Disorderly Conduct

Defendants argue that they are entitled to summary judgment as to Plaintiffs' claims listed in Counts 1, 2, and 9 because they had probable cause to arrest Plaintiffs for disorderly conduct.  (Defs.' Mot. Summ. J. 21-23, 27-28, 30-31).  Under Kentucky law:

> A person is guilty of disorderly conduct in the second degree *when in a public place* and with intent to cause *public* inconvenience, annoyance, or alarm, or wantonly creating a risk thereof, he:
> (a)    Engages in fighting or in violent, tumultuous, or threatening behavior;
> (b)    Makes unreasonable noise;
> (c)    Refuses to obey an official order to disperse issued to maintain public safety in dangerous proximity to a fire, hazard, or other emergency; or
> (d)    Creates a hazardous or physically offensive condition by any act that serves no legitimate purpose.

KRS 525.060(1) (emphasis added).  Commentary to the statute explains its inner-workings:

> [T]he statute requires public alarm as distinguished from private alarm.  For example, *a person may not be arrested for disorderly conduct as a result of activity which annoys only the police.* The statute is not intended to cover the situation in which a private citizen engages in argument with the police so long as the argument proceeds without offensively coarse language or conduct which intentionally or wantonly creates a risk of public disturbance.

*See* KRS 525.060 cmt. (emphasis added). Applying this statute and its commentary, the Sixth Circuit has affirmed a district court's order denying summary judgment for state officials sued under Section 1983 for false arrest when the officials arrested the plaintiff for disorderly conduct and his conduct only disturbed the police and other state employees. *See Kennedy v. City of Villa Hills*, 635 F.3d 210, 214-17 (6th Cir. 2011).

Defendants argue that the undisputed facts show that Plaintiffs committed disorderly conduct because each of them screamed profanity at the officers and refused to go inside. (*See, e.g.*, Defs.' Mot. Summ. J. 22-23). In particular, Defendants claim that—notwithstanding the fact that all of the events giving rise to Plaintiffs' arrests occurred on a secluded lot nearly 300 yards away from the nearest neighbor[19]—Plaintiffs' conduct nonetheless caused a "public alarm" because: (i) "the road to which [Plaintiffs'] driveway attaches is a public road," and (ii) at least one federal case—*Woosley v. City of Paris*, 591 F. Supp. 2d 913 (E.D. Ky. 2008)—held that a dispute on the lawn in front of a person's residence can, in some instances, cause public alarm. (Defs.' Mot. Summ. J. 23).

The record contains no evidence suggesting that Plaintiffs' alleged disorderly conduct annoyed anyone *other than* Defendants—i.e., the police—which indicates that Defendants *did not* have probable cause to arrest them for that offense. *See Kennedy*, 635 F.3d at 214-17. Beyond that, Defendants' "public roadway" argument is unavailing. If credited, Defendants' argument would eviscerate the distinction the Kentucky General Assembly drew between conduct that causes "private alarm" and "public alarm" when drafting the disorderly conduct statute and its commentary in light of the fact that almost all private property abuts public property at some point. *See* KRS 525.060 cmt. Further, *Woosley* is easily distinguishable

---

[19] The Haddens' home is located on an eight-acre tract approximately 300 yards from the nearest neighbor. (Wathen Dep. 109:2-21, DN 65-4).

because the dispute in that case arose in the *common area* outside of an apartment complex—i.e., *a public place*. *See Woosley*, 591 F. Supp. 2d at 920. By contrast, the present dispute arose on private property, far away from any members of the public.

Accordingly, Defendants *did not* have probable cause to arrest Kevin, Michelle, or Caleb for disorderly conduct. There is no evidence suggesting that Plaintiff's actions were taken in a public place or created any public alarm. As a result, Defendants' argument that they are entitled to summary judgment as to Counts 1, 2, and 9 because they had probable cause to arrest Plaintiffs for disorderly conduct fails.[20]

### ii. Menacing

Defendants argue in the alternative that they are entitled to summary judgment as to Plaintiffs' claims as listed in Counts 1, 2, and 9 because they had probable cause to arrest Plaintiffs for menacing. (Defs.' Mot Summ. J. 24-25, 29, 31-32). As already discussed, "[a] person is guilty of menacing when he intentionally places another in reasonable apprehension of imminent physical injury." KRS 508.050(1). Because Defendants appear to argue that Kevin, Michelle, and Caleb each engaged in conduct constituting the crime of menacing, each plaintiff's purported conduct will be examined separately.

<u>*Kevin*</u>. Wathen, Smith, and Adkison argue that Kevin committed menacing when he: (i) reached (or thought about reaching) for a stone to use as a weapon against Wathen; and (ii) advanced toward Wathen in a belligerent manner during Nick's arrest. (*See* Defs.' Mot. Summ. J. 24-25). With respect to their first argument, Defendants have not submitted evidence showing that Kevin reached for a stone or that, if he did, Wathen, Smith, or Adkison were aware of such

---

[20] To underscore the Court's conclusion, the Court notes that Defendants' expert witness conceded Defendants did not have probable cause to arrest Plaintiffs for disorderly conduct. (*See, e.g.*, Day Dep. 127:19-128:6, Jan. 10, 2018, DN 65-17).

action.  Since none of the officers were aware that Kevin reached for a stone, that movement could not have placed them in fear of being injured to create probable cause to arrest Kevin for menacing.  *See Logsdon*, 492 F.3d at 341 (noting that an officer's probable cause determination must be "'drawn from the facts known to the arresting officer at the time of the arrest . . . .'" (quoting *Devenpeck*, 543 U.S. at 152)).

The second argument requires a bit more discussion and a review of the testimony regarding Kevin's arrest.  Smith testified that after Wathen slammed Nick to the ground, Kevin, became irate and "advance[d] towards . . . Wathen"—as if he intended to attack him or insert himself into the scuffle.  (Smith Dep. 33:13-23).  To prevent the Haddens from interfering, Smith extended his ASP.  (Smith Dep. 33:22-23).  Though Wathen *did not see* Kevin advancing toward him, he testified that he *heard* Smith's ASP click as it opened and witnessed Kevin backing away.  (Wathen Dep. 94:16-95:25, 138:12-20).  He further testified that when he heard the ASP click he felt a threat to his safety.  (Wathen Dep. 138:18-23, 144:19-145:22 (comparing hearing an ASP click to the sound of racking a shotgun and noting that an ASP click "puts [him] on alert" that danger is present)).

A reasonable jury could credit Smith's testimony that he extended his ASP to ward off Kevin and, if the jury believes that testimony, then Kevin's menacing conduct arguably formed the foundation for Wathen's fear.  (Smith Dep. 33:13-23).  Likewise, a reasonable jury could credit Kevin and Caleb's testimony, which indicates that Kevin did not advance toward Wathen at all.  (Kevin Aff. ¶¶ 3-5; Caleb Aff. ¶¶ 3-5).  Accordingly, Wathen, Smith, and Adkison's argument that they are entitled to summary judgment as to Kevin's claims in Counts 1, 2, and 9 on the ground that they had probable cause to arrest him for menacing fails due to the significant factual disputes which must be resolved by a jury.

_Michelle_.  Wathen and Smith argue that they had probable cause to arrest Michelle for menacing because she threatened them.  (Defs.' Mot. Summ. J. 28-29).  Specifically, she yelled: "I'll kick your ass [expletive]" at him shortly after he arrested Nick.  (Wathen Dep. 116:12-13). Genuine disputes of fact exist, however, as to whether Michelle actually threatened Wathen and Smith, and, if so, whether they reasonably apprehended bodily injury as a result thereof.  Indeed, while Wathen testified that Michelle was yelling from the deck, Smith testified that he did not hear Michelle make any threats, and Michelle indicated that she was unsure as to whether she even cussed at the officers—much less threatened them.  (Smith Dep. 42:1-7; Michelle Dep. 128:11-129:14).  Similarly, Wathen's own testimony is unclear as to whether he actually felt threatened by Michelle.  In fact, he specifically testified that he was not "really thinking [that Michelle was] going to come right at [him] . . . ."  (Wathen Dep. 118:11-15).  As a result, Wathen is not entitled to summary judgment as to Michelle's claims in Counts 1, 2, and 9 on the ground that he had probable cause to arrest her for menacing.[21]

_Caleb_.  Wathen avers that he had probable cause to arrest Caleb for menacing because Caleb aggressively clenched his fists and began shaking and yelling at Wathen after Wathen arrested Michelle.  (Defs.' Mot Summ. J. 31-32).  It was Adkison, however, not Wathen, who testified that he saw Caleb clench his fists and walk toward Wathen in an aggressive manner. (_See_ Adkison Dep. 54:21-55:7).  While this testimony might support the proposition that Caleb menaced Wathen, Wathen _did not testify_ that Caleb behaved in this way, and, therefore, it is unclear whether Wathen actually knew of the facts that form the basis for Defendants' argument that Caleb menaced Wathen.  Accordingly, Wathen is not entitled to summary judgment as to

---

[21] Because disputes of fact exist as to whether Wathen had a basis to arrest Michelle for terroristic threatening, Michelle is not entitled to summary judgment on Counts 1 and 2.

Caleb's claims in Counts 1, 2, and 9 on the ground that he had probable cause to arrest for menacing.[22]

### iii.     Obstructing Governmental Operations

Next, Defendants assert that they are entitled to summary judgment as to Plaintiffs' claims in Counts 1, 2, and 9 of the Complaint because Defendants had probable cause to arrest them for obstructing governmental operations. (Defs.' Mot Summ. J. 25-26, 29-30, 32-33). They claim that Kevin, Michelle, and Caleb obstructed "their investigation of potential crimes by Nick" when they shouted at Wathen. (*See, e.g.*, Defs.' Mot. Summ. J. 25-26).

Defendants' position is unavailing. Under Kentucky law, "[a] person is guilty of obstructing governmental operations when he intentionally obstructs, impairs or hinders the performance of a governmental function by using or threatening to use violence, force or physical interference." KRS 519.020(1). Though some testimony indicates that Plaintiffs yelled at and criticized the officers after Wathen arrested Nick, criticizing police conduct is quite different from "using or threatening to use violence" to obstruct an investigation. *See id.* And in any event—because the First Amendment requires that police officers tolerate coarse criticism— Plaintiffs' yelling and criticism of Defendants' conduct *cannot* serve as the basis of their arrests. *See City of Houston v. Hill*, 482 U.S. 451, 461 (1987). Further, to the extent Defendants argue that Michelle threatened to interfere with Defendants' investigation insofar as she told Wathen that she would "kick [his] ass," the record does not unambiguously reflect that she made that threat or that Wathen perceived it as such. (*Compare* Wathen Dep. 116:12-13, *with* Smith Dep. 42:1-7, *and* Michelle Dep. 128:11-129:14). Accordingly, Defendants are not entitled to summary judgment as to Plaintiffs' claims in Counts 1, 2, and 9.

---

[22] For these same reasons, Caleb is not entitled to summary judgment on Counts 1 and 2.

### iv.    Harassing Communications

Wathen, Smith, and Adkison argue that they are entitled to summary judgment as to Kevin's claims against them as listed in Counts 1, 2, and 9 of the Complaint because they had probable cause to arrest him for harassing communications.  (Defs.' Mot Summ. J. 26-27).  In particular, they argue that Kevin uttered harassing communications when he yelled and cursed while on the phone with the 911 operator.  (Defs.' Mot. Summ. J. 26-27).

Under Kentucky law, "[a] person is guilty of harassing communications when, with intent to intimidate, harass, annoy, or alarm another person, he or she" communicates with another—typically in a manner that "causes annoyance or alarm"—*without a legitimate purpose*.  KRS 525.080(1).  Here, although Kevin yelled at the 911 operator and may have annoyed her or caused her to be alarmed, he purportedly had a legitimate purpose for initiating the communication:  namely, he was afraid that his son was severely injured.  A dispute of fact exists as to Kevin's purpose for calling 911, and Wathen, Smith, and Adkison's motion for summary judgment as to Kevin's contention that there was a lack of probable cause to arrest him for harassing communications is denied.

### v.    Terroristic Threatening

Wathen and Smith contend that they are entitled to summary judgment as to Michelle's claims against them as listed in Counts 1, 2, and 9 of the Complaint because they had probable cause to arrest her for terroristic threatening.  (Defs.' Mot. Summ. J. 28-29).  Specifically, they claim that Michelle committed terroristic threatening when she shouted:  "I'll kick your ass [expletive]" at him shortly after he arrested Nick.  (Wathen Dep. 116:12-13).

As noted, genuine disputes of fact exist as to whether Michelle actually threatened Wathen, and, if so, whether he reasonably apprehended bodily injury as a result thereof.

(*Compare* Wathen Dep. 118:11-15, *with* Smith Dep. 42:1-7, *and* Michelle Dep. 128:11-129:14). Wathen and Smith are therefore not entitled to summary judgment as to Michelle's claims in Counts 1, 2, and 9 on the basis they had probable cause to arrest her for terroristic threatening.

### 2. *Immunity*

Having concluded that genuine disputes of material fact exist as to whether the Defendants violated Plaintiffs' Fourth Amendment rights by arresting them without probable cause, the next question is whether any of the Defendants implicated in these claims are immune from liability. As discussed above, though qualified immunity is applicable to Plaintiffs' federal claims (Counts 1 and 2), Kentucky law on qualified official immunity applies to Plaintiffs' state claims (Count 9). Both standards call for essentially the same analysis, so the Court will jointly address each type of immunity.

Wathen, Smith and Adkison argue that they are entitled to qualified immunity from liability as to Plaintiffs' claims in Counts 1, 2, and 9. (Defs.' Mot. Summ. J. 53-56). Under federal law, "[l]aw-enforcement officers enjoy qualified immunity from suit when their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *King v. Harwood*, 852 F.3d 568, 582 (6th Cir. 2017) (citation omitted). Similarly, to obtain a judgment against a state official based on a claim arising under Kentucky law, a plaintiff must show that the events precipitating his suit involve an official committing an act that "violates constitutional, statutory, or clearly established rights, or . . . [an act] done willfully or maliciously with intent to harm . . . ."[23] *Autry v. W. Ky. Univ.*, 219 S.W.3d 713, 717 (Ky. 2007). In other words, qualified immunity is appropriate as a matter of federal and state law only if Wathen, Smith and Adkison violated Plaintiffs' clearly established

---

[23] Both standards also require that the challenged official action be discretionary, but the parties do not dispute that element in this case.

constitutional rights, and, in doing so, failed to act in an objectively reasonable manner. *Goins*, 2017 WL 3097613, at *8.

Wathen, Smith, and Adkison base their qualified immunity argument solely on the fact that they had probable cause to arrest Plaintiffs. (Defs.' Mot. Summ. J. 53-56). In other words, Wathen, Smith, and Adkison *do not* argue that the right to be free from arrest without probable cause is *not* clearly established (nor could they)[24] or that their behavior was objectively reasonable.

As a result, qualified immunity is inappropriate for determination on summary judgment. Given that factual disputes exist as to whether Wathen, Smith and Adkison had probable cause to arrest Plaintiffs, it is unclear whether they violated Plaintiffs' clearly established right to be free from warrantless arrests without probable cause. *See Goins*, 2017 WL 3097613, at *8. In addition, Wathen, Smith, and Adkison have not argued that their behavior was reasonable, so the Court is unable to make that determination at this time. *See id.* (declining to grant qualified immunity to an officer when disputes of fact existed as to whether the defendant violated the plaintiff's rights and the defendant failed to argue that his alleged misconduct was reasonable). Wathen, Smith, and Adkison are not entitled to summary judgment as to Counts 1 and 2 on qualified immunity grounds.

In sum, neither Wathen nor Smith is entitled to summary judgment as to Plaintiffs' claims as stated in Counts 1, 2, and 9; Adkison is not entitled to summary judgment as to Kevin's claims as listed in those counts, but is entitled to summary judgment as to any other claims

---

[24] "It is clearly established that individuals have a right to remain free from arrest without probable cause." *Goins*, 2017 WL 3097613, at *8 (citing *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 310 (6th Cir. 2005)).

asserted against him; and Carmichael is entitled to summary judgment as to Plaintiffs' claims in Counts 1, 2, and 9.

**B.      Count 3:  Excessive Force**

Nick claims that Wathen is liable to him for using excessive force—i.e., body-slamming him—during the course of his arrest.  (Compl. ¶¶ 70-82).  The Supreme Court has long held that "the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to affect it."  *Graham v. Conner*, 490 U.S. 386, 396 (1989) (citation omitted).  That said, the "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id.* (citation omitted).  Nonetheless, the Sixth Circuit has held that there is "no need for *any* force" when "no crime [has been or is] being committed and there [is] no immediate threat to the safety of anyone . . . ."  *Harris v. Langley*, 647 F. App'x 585, 590 (6th Cir. 2016).

Wathen argues that he is entitled to summary judgment as to Nick's excessive force claim.  (Defs.' Mot. Summ. J. 39-43).  The essence of Wathen's argument is that he used a police maneuver called the "straight arm bar takedown" and was completely justified in doing so because Nick:  (i) had committed an offense—i.e., menacing; and (ii) was "posing an immediate threat to his safety . . . ."  (Defs.' Mot. Summ. J. 42).

Wathen's arguments are unconvincing.  Disputes of fact exist as to whether Wathen used the straight arm bar takedown on Nick because he was, in fact, menacing, or, alternatively, whether Wathen body-slammed Nick simply for "mouthing off."  (*Compare* Wathen Dep. 73:6-12, 75:3-76:18, 80:9-16 (testifying that Nick thrusted toward him and posted an immediate threat to his safety), *with* Michelle Dep. 108:14-18, 109:7-10 (testifying that Wathen "slammed Nick to the ground" for responding sarcastically to a statement by Wathen)).  That said, whether Nick

committed an offense and/or posed a threat to Wathen's safety is disputed, thus the Court cannot determine whether Wathen's behavior constituted "unprovoked violence" or an appropriate response to the situation. *See Harris*, 647 F. App'x at 590.

Wathen further claims that, because he was justified in his use of force in arresting Nick, he did not violate any of Nick's constitutional rights—much less a clearly-established right—and is therefore entitled to qualified immunity. (Defs.' Mot. Summ. J. 56). This argument is similarly unpersuasive. As noted, the record is unclear as to whether Wathen's actions were justified. Further, the Sixth Circuit has clearly established that an officer cannot body-slam an individual who has *not* committed an offense and is *not* posing a threat to anyone's safety. *See Harris*, 647 F. App'x at 590. Similarly, the Court cannot determine at this time whether Wathen is entitled to qualified immunity on this claim. *See Goins*, 2017 WL 3097613, at *8.

C.    **Counts 4 and 5:  Assault and Battery**

Next, Plaintiffs claim that Defendants assaulted and battered them during their arrests. (Compl. ¶¶ 79-86). Specifically, Nick, Michelle, and Caleb assert their assault and battery claims against Wathen, while Kevin asserts his against Wathen and Adkison.[25] (*See* Pls.' Resp. 37-39).

Under Kentucky law, an assault occurs when one intentionally threatens to touch another, "while battery requires an actual [and intentional] unwanted touching." *Banks*, 39 S.W.3d at 480. An individual cannot be liable for assault and battery, however, under certain statutorily defined circumstances. *See* KRS 503.090(1); *Woosley*, 591 F. Supp. 2d at 922-23 (applying KRS 503.090 to claims of assault and battery).

---

[25] For the purposes of this section, the Court jointly refers to Wathen and Adkison as "Defendants."

Given Kentucky law surrounding assault and battery, the Court will separate its analysis into two questions: First, whether Plaintiffs have presented evidence sufficient to survive summary judgment on these claims, and second, if so, whether Defendants can avoid liability on Plaintiffs' assault and battery claims pursuant to KRS 503.090.

### 1. Prima Facie *Case*

Plaintiffs have presented evidence sufficient to support their assault claims. Michelle testified that, prior to Nick's arrest, Wathen got "up in [Nick's] face," pointed "his finger . . . [at Nick's] nose," and shouted "'[d]on't you ever disrespect me like that again.'" (Michelle Dep. 108:14-18). A reasonable jury could infer from this testimony that Nick felt threatened. Further, Wathen evidently approached Kevin, Michelle, and Caleb and told them to be quiet and go inside or be arrested.[26] (Adkison Dep. 48:2-9; Wathen Dep. 103:15-17; Caleb Dep. 44:23-45:11). The threatened arrest would have included an unwanted touching, and a jury might therefore find that Wathen's words and conduct constituted an assault on Kevin, Michelle, and Caleb. *See Woosley*, 591 F. Supp. 2d at 922-23 (implying that a threat of arrest is sufficient to establish a claim for assault).

Plaintiffs have likewise submitted enough evidence to establish a claim for battery, and there is no question all Plaintiffs were arrested by Wathen and Adkison assisted in Kevin's arrest. (*See* Smith Dep. 34:24-35:1; Wathen Dep. 113:5-7, 121:1-10, 133:10-13; Michelle Dep. 143:6-13).

### 2. *Privilege – KRS 503.090*

Having concluded that Plaintiffs have submitted evidence sufficient to support their assault and battery claims, the Court must now assess whether Wathen and/or Adkison can avoid

---

[26] Caleb further testified that Wathen "started [walking] towards [him] in an aggressive manner" when he asked Wathen for his badge number. (Caleb Dep. 45:3-7).

liability on those claims pursuant to KRS 503.090. That statute provides that an individual "acting under official authority" cannot be held liable for assault or battery if he uses or threatens to use force against the other while "making or assisting in making an arrest" so long as he: "(a) [b]elieves that such force is necessary to effect the arrest; (b) [m]akes known the purpose of the arrest or believes that it is otherwise known or cannot reasonably be made known to the person to be arrested; and (c) [b]elieves the arrest to be lawful." KRS 503.090(1)(a)-(c). The commentary further explains that the statute "seeks to justify the use of force as is believed by a defendant to be necessary to effect what he *believes* to be a lawful arrest. A mistake as to either or both of those beliefs does not deprive a defendant of the justification afforded by this" statute. KRS 503.090 cmt. (emphasis in original); *Woosley*, 591 F. Supp. 2d at 922-23 (applying KRS 503.090 to claims of assault and battery).

The first element of KRS 503.090(1) is not satisfied in this case. Given that the Court must view the facts in a light most favorable to Plaintiffs, the Court finds that a reasonable jury could conclude that Wathen and Adkison did not have a basis to use force to effect Plaintiffs' arrests. Defendants are therefore not entitled to summary judgment on these claims.

### D.    Count 6:  Abuse of Process

Plaintiffs also claim that Defendants committed abuse of process when they initiated criminal proceedings against them. (Compl. ¶¶ 87-93). Kentucky law provides that the tort of abuse of process "consists of 'the employment of legal process for some other purpose than that which it was intended by the law to effect.'" *Simpson v. Laytart*, 962 S.W.2d 392, 394 (Ky. 1998) (internal quotation marks omitted) (citations omitted). "Some definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process is required and there is no liability where the defendant has done nothing more than carry out the

process to its authorized conclusion even though with bad intentions." *Id.* at 394-95 (citation omitted).

In essence, Plaintiffs' abuse of process claims are that Defendants employed Plaintiffs' criminal prosecutions for one or more of the following ulterior and wrongful purposes: (i) "to excuse and cover up their unlawful search and seizure of the Plaintiffs and use of force against Nick and Caleb," (ii) "to secure leverage against the Plaintiffs with which to intimidate, coerce, threaten, or compel them not to challenge [Defendants']" conduct," (iii) "to punish and retaliate against . . . Plaintiffs for voicing their objections to [Defendants'] conduct," and (iv) "to silence the Plaintiffs' right to free speech." (Compl. ¶ 91).

Problematically, however, Plaintiffs have not submitted any evidence supporting their contention that one or more of Defendants acted with any ulterior purpose. Indeed, while the record may be unclear as to whether Defendants had probable cause to arrest and prosecute Plaintiffs, there is no proof that Defendants' role in the prosecution was motivated by any ulterior purpose. As a result, Defendants are entitled to summary judgment on Plaintiffs' abuse of process claims. *See Mullins v. Richards*, 705 S.W.2d 951, 952 (Ky. 1986) (affirming grant of summary judgment on abuse of process claim in the defendants' favor when the plaintiffs failed to present any evidence that the defendants used plaintiffs' prosecution against them "outside the criminal proceeding.").

### E. Counts 7 and 8: State & Federal Malicious Prosecution

Next, Plaintiffs claim that Defendants violated both state and federal law when they maliciously instituted criminal proceedings against Plaintiffs without probable cause. (Compl. ¶¶ 96-109). Because a federal claim for malicious prosecution involves slightly different elements than its state-law counterpart, each claim will be addressed separately.

Before addressing these claims, however, it is necessary to set forth which Defendants—if any—participated in each Plaintiffs' prosecution. Kevin alleges that Wathen and Smith arrested him, and that Adkison completed the paperwork that resulted in his prosecution. (*See* Compl. ¶¶ 96-109). He also claims that Carmichael participated in his prosecution insofar as Carmichael participated in Kevin's arrest. (*See* Pls.' Resp. 38-39). The Court has found, however, that Carmichael *did not* play a role in Kevin's arrest, and Plaintiffs have submitted no further evidence or argument outlining Carmichael's involvement in Kevin's prosecution. Michelle claims that Wathen and Smith maliciously prosecuted her insofar as both officers participated in her arrest. Caleb claims that Wathen and Adkison played a role in his prosecution, but the record reflects that Wathen alone arrested and initiated Caleb's prosecution. (Caleb Dep. 45:12-18 (testifying that Wathen—acting alone—arrested Caleb)). .

In sum, the record does not support Plaintiffs' position that Carmichael aided in Kevin's prosecution, or that Adkison contributed to Caleb's prosecution. Thus, Kevin's malicious prosecution claims are against Wathen, Smith, and Adkison, Michelle's malicious prosecution claim are against Wathen and Smith, and Caleb and Nick's malicious prosecution claims are against Wathen.[27]

### 1. *Kentucky Law: Malicious Prosecution*

The Kentucky Supreme Court recently clarified the essential elements of a claim for malicious prosecution under Kentucky law. In particular, the Kentucky Supreme Court held that "[a] malicious prosecution action may be established by showing that:"

> 1) [T]he defendant initiated, continued, or procured a criminal or civil judicial proceeding, or an administrative disciplinary proceeding against the plaintiff;

---

[27] For the purposes of this subsection, the Court will jointly refer to Wathen and Adkison as "Defendants."

2)   [T]he defendant acted without probable cause;

3)   [T]he defendant acted with malice, which, in the criminal context, means seeking to achieve a purpose other than bringing an offender to justice; and in the civil context, means seeking to achieve a purpose other than the proper adjudication of the claim upon which the underlying proceeding was based;

4)   [T]he proceeding, except in ex parte civil actions, terminated in favor of the person against whom it was brought; and

5)   [T]he plaintiff suffered damages as a result of the proceeding.

*Martin v. O'Daniel*, 507 S.W.3d 1, 11-12 (Ky. 2016). With respect to the first element, the court explained that "procuring" a criminal proceeding against an individual "is synonymous with 'being the proximate and efficient cause of putting the law in motion'" and includes, at a minimum: arresting the individual or filing a criminal complaint or indictment against him. *Id.* at 12 (citation omitted).

### a.   Merits

Defendants argue that Plaintiffs' malicious prosecution claims fail for three reasons. First, Defendants claim that they did not initiate or otherwise play a role in Plaintiffs' criminal proceedings. (*See, e.g.*, Defs.' Mot. Summ. J. 21). Second, Defendants assert that they had probable cause to arrest Plaintiffs. (*See, e.g.*, Defs.' Mot. Summ. J. 21). And third, Defendants aver that Plaintiffs' malicious prosecution claims fail because Plaintiffs have failed to submit evidence showing that Defendants acted with malice. (*See, e.g.*, Defs.' Mot. Summ. J. 20).

Defendants' first argument fails. Wathen arrested Nick, Michelle, and Caleb, and drafted their uniform citations, which, under Kentucky law, are charging documents. *See Skeans v. Commonwealth*, 912 S.W.2d 455, 456 (Ky. 1995) (citations omitted); (Uniform Citations 4-6; Smith Dep. 34:24-35:1; Michelle Dep. 143:6-13; Wathen Dep. 121:1-10, 133:10-13). In addition, Smith assisted in arresting Michelle and Caleb. (Smith Disc. Resp. 5). Further, Wathen and Adkison arrested Kevin, and Adkison completed Kevin's citation. (*See* Uniform

Citations 3; Wathen Dep. 111:11-14; Adkison Dep. 42:12-43:4).    Under *Martin*, the Court concludes that—by arresting Plaintiffs and filing charging documents against them—Defendants were the "proximate and efficient cause" of Plaintiffs' prosecutions.  *See Martin*, 507 S.W.3d at 12.

     Their second and third arguments fare no better.   As discussed above, the record is unclear as to whether Defendants had probable cause to arrest Plaintiffs.   Further, Kentucky law holds that the jury may infer that an official maliciously initiated criminal proceedings against a plaintiff if the official did not have probable to arrest or prosecute the plaintiff.  *See Phat's Bar & Grill*, 918 F. Supp. 2d at 665 (citations omitted).   As a result, Plaintiffs have presented evidence supporting each element of their claims for malicious prosecution under Kentucky law, and Defendants are therefore not entitled to summary judgment on these claims.[28]

### b.    Immunity

     Defendants also argue that—even if Plaintiffs' malicious prosecution claims survive summary judgment on the merits—those claims should be dismissed because Defendants are entitled to immunity.   As previously discussed, Defendants are entitled to qualified immunity so long as they have not violated Plaintiffs' "clearly established [constitutional] rights, or . . . [acted] willfully or maliciously with intent to harm . . . ."[29]  *Autry*, 219 S.W.3d at 717.

---

[28] Defendants also argue that Nick's malicious prosecution claim fails because he ultimately pled guilty to possession of marijuana, and, therefore, certain of the criminal proceedings initiated against him were not terminated in his favor.  This argument ignores the fact that Nick was also charged with menacing, resisting arrest, and terroristic threatening, and that each of these charges *was* resolved in his favor.  As a result, Nick may proceed on the theory that Wathen brought certain of the charges against him maliciously.

[29] As previously discussed, qualified official immunity only protects officials who commit torts while performing discretionary acts, and the parties do not contest the fact that Wathen and Adkison executed discretionary functions when they arrested Plaintiffs.

The problem with Defendants' position is that the Kentucky Supreme Court has held that the qualified immunity defense is "unavailable in . . . malicious prosecution action[s] . . . ." *Martin*, 507 S.W.3d at 5-6. This makes sense: qualified immunity "is available only to official acting in good faith," and "[a]cting with malice and acting in good faith are mutually exclusive." *Id.* (describing qualified immunity defense as "superfluous" when raised against malicious prosecution claim) (citation omitted). Therefore, qualified immunity does not shield Defendants from liability as to Plaintiffs' state-law malicious prosecution claims.

### 2. *Section 1983: Malicious Prosecution*

With respect to Plaintiffs' federal malicious prosecution claim, Wathen, Smith, and Adkison assert that they are entitled to summary judgment because, *inter alia*, they did not participate in the decision to prosecute Plaintiffs. (Defs.' Mot. Summ. J. 13). To survive summary judgment on a claim for malicious prosecution under Section 1983, a plaintiff must present evidence showing that: (i) the defendant "ma[d]e, influence[d], or participate[d] in the decision to prosecute" the plaintiff; (ii) the defendant lacked probable cause to arrest and prosecute the plaintiff; (iii) the plaintiff suffered a deprivation of liberty *apart from* his initial seizure; and (iv) the criminal prosecution was resolved in the plaintiff's favor. *See Sykes v. Anderson*, 625 F.3d 294, 308-09 (6th Cir. 2010) (citations omitted). As relevant here, the Sixth Circuit has further explained that—in order to "participate" in a decision to prosecute—a defendant must do more than simply "aid[]" the prosecutor in "a passive or neutral way." *Johnson v. Moseley*, 790 F.3d 649, 654 (6th Cir. 2015) (citation omitted). "[T]here must be some element of blameworthiness or culpability in the [defendant's] participation"—i.e., "truthful participation in the prosecution decision is not actionable." *Id.* (citation omitted). Thus, for the purposes of Section 1983 malicious prosecution claims, an officer actively

participates in the decision to prosecute an individual when, for instance, he *deliberately* provides false information to the prosecutor; but if he negligently or innocently provides such information to the prosecutor, he has not "participated" in the criminal proceedings in the relevant sense. *Id.* (citations omitted).

Defendants' argument fails. While this Court has previously held that an officer does not "participate" in the decision to prosecute an individual simply by arresting him, Wathen and Adkison also completed Plaintiffs' arrest citations, and the record is unclear as to whether Smith assisted them in doing so. *See Hartman v. Thompson*, No. 3:16-CV-00114-GNS-DW, 2018 WL 793440, at *12 (W.D. Ky. Feb. 7, 2018), *appeal docketed*, No. 18-5220 (6th Cir. 2018). If Plaintiffs are to be believed, the contents of those citations are false and, therefore, a reasonable jury could conclude that Defendants participated in Plaintiffs' prosecution. Further, genuine disputes of material fact exist as to whether Wathen, Smith, and Adkison had probable cause to arrest Plaintiffs. Defendants are not entitled to summary judgment on Plaintiffs' Section 1983 malicious prosecution claims.

In sum, Kevin's state-law malicious prosecution claims against Wathen, Smith, and Adkison, Michelle's malicious prosecution claims against Wathen and Smith, and Nick and Caleb's malicious prosecution claims against Wathen survive summary judgment.

F.    **Count 10:  First Amendment – Retaliatory Arrest**

Plaintiffs' final claim is that Defendants arrested them for criticizing Defendants' alleged misconduct. (Compl. ¶¶ 115-19). Because the Court has already concluded that Wathen, Smith, and Adkison arrested Kevin, that Wathen and Smith arrested Michelle, and that Wathen arrested Nick and Caleb, the Court's analysis is limited to whether those particular officers arrested Plaintiffs for their speech.

1. *Merits*

The Sixth Circuit has held that a plaintiff must prove three elements to prevail on a retaliatory arrest claim. First, he must demonstrate that he "engaged in protected conduct . . . ." *Kennedy*, 635 F.3d at 217 (citation omitted). Second, he must show that an adverse action was taken against him—i.e., that he was arrested. *Id.* (citation omitted). And third, the plaintiff must establish "a causal connection between elements one and two—that is, the adverse action was motived at least in part by the plaintiff's protected conduct." *Id.* (citation omitted).

Defendants contest only the causation element of Plaintiffs' retaliatory arrest claim. (*See* Defs.' Mot. Summ. J. 44-45). In particular, Defendants assert that Plaintiffs cannot prove that they were arrested as a result of their speech because there was probable cause to arrest them for various offenses—this argument fails. (Defs.' Mot. Summ. J. 44-45).

Regarding causation the Sixth Circuit has explained that, "[a] 'motivating factor' is essentially [a] but-for cause . . . ." *Leonard v. Robinson*, 477 F.3d 347, 355 (6th Cir. 2007) (citation omitted). Further—"[b]ecause direct evidence of motive is difficult to produce[]"— Plaintiffs may rely on circumstantial evidence in proving causation, such as: (i) the temporal proximity of the protected activity and the adverse action; and (ii) whether any alternative justification exists for the adverse action. *See Kennedy*, 635 F.3d at 218 (citations omitted); *see also Wesley v. Rigney*, 913 F. Supp. 2d 313, 329 (E.D. Ky. 2012), *rev'd on other grounds*, 779 F.3d 421 (6th Cir. 2015). "Once a plaintiff raises an inference that the defendant's conduct was motivated in part by plaintiff's protected activity, the burden shifts and defendant 'can demonstrate that it would have taken the same action in the absence of the protected activity.'" *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 821 (6th Cir. 2007) (citations omitted).

In light of this precedent, Defendants' argument fails. The record reflects that each Plaintiff engaged in protected activity shortly before Defendants arrested them. (*See, e.g.*, Caleb Dep. 44:23-45:11 (explaining that he—i.e., Caleb—asked Wathen for his badge number and was arrested immediately thereafter)). A jury could reasonably infer from these facts that Defendants were motivated to arrest Plaintiffs *because* of their speech. *See Kennedy*, 635 F.3d at 219 (denying summary judgment for an officer defendant when he arrested the plaintiff "immediately after" the plaintiff called him a "fat slob"). That said, the burden shifts to Defendants, who argue only that they had probable cause to arrest Plaintiffs. (Defs.' Mot. Summ. J. 44-45). While this argument tends to show that Defendants "would have [arrested Plaintiffs] in the absence of the protected activity," it does not mandate a finding for summary judgment in Defendants' favor because, as noted at length above, the undisputed facts do not establish that Defendants had probable cause to arrest Plaintiffs. *See Ctr. for Bio-Ethical Reform*, 477 F.3d at 821.

## 2. *Qualified Immunity*

The final inquiry regarding Plaintiffs' retaliatory claims is whether Defendants are entitled to qualified immunity. As discussed above, "[l]aw-enforcement officers enjoy qualified immunity from suit when their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *King*, 852 F.3d at 582 (citation omitted). In other words, qualified immunity is appropriate as a matter of federal law only if Wathen and Adkison violated Plaintiffs' clearly established constitutional rights, and, in doing so, failed to act in an objectively reasonable manner. *See Goins*, 2017 WL 3097613, at *8.

Again, Defendants argue that they are entitled to immunity from Plaintiffs' claims because they had probable cause to arrest them. (Defs.' Mot. Summ. J. 60). They do not argue that their actions were objectively reasonable. In light of the disputed facts in this case,

Defendants are not entitled to qualified immunity at this time. Accordingly, Plaintiffs' retaliatory arrest claims against Wathen and Adkison may proceed.

## VI. <u>CONCLUSION</u>

For the foregoing reasons, **IT IS HEREBY ORDERED** that Plaintiffs' Motion for Partial Summary Judgment (DN 65) is **DENIED**, and Defendants' Joint Motion for Summary Judgment (DN 67) is **GRANTED IN PART** and **DENIED IN PART**.

**Greg N. Stivers, Judge**
**United States District Court**
September 5, 2018

cc:     counsel of record